# United States Court of Appeals

## For the First Circuit

No. 25-1452

CALVARY CHAPEL BELFAST,

Plaintiff, Appellant,

v.

UNIVERSITY OF MAINE SYSTEM; BOARD OF TRUSTEES FOR THE UNIVERSITY
OF MAINE SYSTEM; RYAN LOW, individually and in the official
capacity as Vice Chancellor for Finance and Administration,
University of Maine; RACHEL PIPER, in the official capacity as
Executive Director of Strategic Procurement and Services,
University of Maine System; ROBYN CYR, in the official capacity
as Senior Director of Strategic Procurement, University of Maine
System; DEREK HOUTMAN, in the official capacity as Associate
Strategic Sourcing Director, University of Maine System,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Stacey D. Neumann, U.S. District Judge]

Before

Montecalvo, Lipez, and Kayatta,
Circuit Judges.

Daniel J. Schmid, with whom Stephen C. Whiting, Whiting Law
Firm, Mathew D. Staver, Horatio G. Mihet, and Liberty Counsel were
on brief, for appellant.
Melissa A. Hewey, with whom Jeana M. McCormick and Drummond
Woodsum were on brief, for appellees.

June 30, 2026

**LIPEZ**, <u>Circuit Judge</u>.  At the close of a competitive bid process during the summer of 2024, the University of Maine System ("the University") selected Calvary Chapel Belfast ("Calvary" or "the Church") as the winning bidder for the purchase of the Frederick Hutchinson Center property, a former educational hub located in the town of Belfast.  There was a swift and loud public outcry against the prospective sale to the Church.  About a month later, in response to two administrative appeals by disappointed bidders, the University determined that its evaluative criteria were flawed.  The University then cancelled the award to Calvary, initiated a new public procurement process, and ultimately awarded the bid to one of Calvary's competitors.

Calvary filed suit in federal court, arguing that the University's decisionmaking was infected with unconstitutional anti-religious bias.  The Church sought emergency court orders to stop the sale while it pursued its lawsuit to restore its winning bid.  The district court denied Calvary's separate motions for a temporary restraining order (TRO) and preliminary injunction, concluding with respect to each that Calvary had not demonstrated a likelihood of success on the merits of its Equal Protection or Free Exercise Clause claims.

Finding no error in the court's application of the relevant legal principles or clear error in its assessment of the facts, we affirm.

## A. Factual Background

We borrow liberally from the district court's well-stated recitation of the facts. See Waldron v. George Weston Bakeries Inc., 570 F.3d 5, 7 (1st Cir. 2009) ("We rehearse the facts as found by the district court, consistent with record support [in preliminary injunction appeals]."). We set forth these facts in considerable detail as a necessary prelude to the legal analysis that follows.

Plaintiff-Appellant Calvary Chapel Belfast is a nonprofit independent church that is part of the global Calvary Chapel Association, a "network of churches committed to Biblical teaching and Christ-centered community outreach."[1] Defendant-Appellee University of Maine System is Maine's state university system, operating seven universities across the state, with the University of Maine ("UMaine"), located in Orono, as its flagship. The Frederick Hutchinson Center property ("the Hutchinson Center" or "the Center") operated as UMaine's Midcoast satellite campus for about twenty years, serving more than 16,000 learners at its height as "a vibrant hub for university education and community events in the midcoast." When use of the Center

---

[1] The Church is led by Pastor Greg Huston, who has served in that role for approximately nine years and is also the Church's Chief Executive Officer.

declined significantly during and following the COVID-19 pandemic, the University decided to sell the Center using its competitive public procurement process[2] and the issuance of a Request for Proposals ("RFP").[3]  See News Release, Univ. of Me. Sys., University of Maine System Trustees authorize sale of Hutchinson Center in Belfast (July 15, 2024), https://www.maine.edu/blog/2024/07/15/ university-of-maine-system-trustees-authorize-sale-of-hutchinson -center-in-belfast/ [https://perma.cc/K9SU-XKCT].

**1. The First RFP**

On January 17, 2024, the University issued RFP #2024-048 (the "First RFP") to solicit "purchase, lease, or alternative creative real property offers" for the Center.[4]  The University

---

[2] As defined by the University, the competitive procurement process generally "[r]efers to all methods of obtaining prices from multiple vendors including selections based on bid price alone, qualifications alone or best value."  The public process is a means of "obtain[ing] all goods and services at the lowest cost to the University consistent with those standards of quality, performance, service, and availability which will best meet the needs of the University."

[3] The University defines an RFP as the "document used to solicit proposals . . . when a product or service cannot be specifically defined," with "evaluation generally . . . based on a variety of criteria such as a proposal's ability to meet the identified need, the qualifications of the provider, the proposal's conformity with the available specifications, and other factors as determined useful."  By policy, the University's RFP awards "will be made to the [responding bidder] whose proposal is determined to best meet the needs of the University taking into consideration the evaluation criteria set forth in the RFP."

[4] The University's Office of Strategic Procurement is

structured the bid process on a 100-point scale, with points awarded based on criteria such as the submitted purchase price and the terms of any financing requirements. The RFP stated that the University would award the highest-scoring bidder the exclusive right to negotiate a final real estate contract with the University for the Center.

By the close of an eight-month submission period, the University received three timely offers in response to the First RFP: a $1 million purchase and sale offer from Calvary; a $1 million purchase and sale offer from Waldo Community Action Partners ("Waldo"); and an alternative creative real property offer[5] from Future of the Hutchinson Center Steering Committee and Waterfall Arts ("Waterfall Arts"). To make a competitive offer, Calvary began to liquidate assets around the time of its bid, including selling its current property (a utility trailer and a

_____

responsible for drafting and evaluating all RFPs. Generally speaking, the individually named Defendant-Appellees Ryan Low (the University's Vice Chancellor of Finance and Administration), Rachel Piper (the University's Strategic Director for Procurement/Chief Procurement Officer), Robyn Cyr (the University's Senior Director for Strategic Sourcing), and Derek Houtman (the University's Associate Director of Strategic Sourcing) have varying levels of involvement with the University's public procurement process.

[5] The University included an option for a so-called "Alternative Creative Real Property Offer" for "individuals or entities who would not or potentially could not have the financial ability to provide conventional offers for sale or lease."

shipping container) for a total of $115,000. Calvary also sought, and later secured, $750,000 in additional financing from TD Bank.

**(a) Terms of the First RFP**

The district court and the parties highlight several key provisions of the First RFP relevant to this dispute. First, Section 2.4 required that the winning bidder's negotiation of the final contract "may not significantly vary the content, nature or requirements of the proposal or the University's [RFP] to an extent that may affect the price of goods or services requested." The same section additionally provided that the "University may cancel the [RFP] at its sole discretion."

With respect to the administrative appeals process, the text of the First RFP specified that parties could file two different types of challenges to protest the RFP. Prior to submitting a response, a prospective bidder could challenge the terms as anticompetitive via a "Specification Protest." As later explained by the University's Executive Director of Strategic Procurement and Services, Rachel Piper, specification protests are appropriate when "a potential respondent who is interested in providing a response to a solicitation sees something that is written within the RFP specifications that would prohibit them from submitting," thereby providing a pre-deadline means of "identify[ing] . . . areas they feel are restrictive in competition" and seeking redress. Section 1.8 of the First RFP

- 7 -

detailed the process and remedies for specification protests, including that respondents should direct such protests to the University's Office of Strategic Procurement. Section 1.8 also established that these pre-deadline challenges would, without exception, be considered and responded to only if submitted "no less than five (5) business days" before the final deadline for submissions.

After the University selected the winning bid, disappointed respondents could appeal the University's decision via an "Award Protest." Section 2.5 of the First RFP specified that respondents had five business days following notification of the University's award decision to submit an award protest -- including a written statement of the specific basis for the challenge -- to the University's Executive Director of Strategic Procurement and Services, who at the time was Piper. Section 2.5 further established that, for award protests, the University would follow its standard, internal appeals process, as set forth in the University's Administrative Practice Letter VII-A ("Letter VII-A").

As detailed in Letter VII-A, the University's standard administrative appeals process provides two levels of review, with the second level being the final decision. Piper routinely served as the University's initial decisionmaker at the first appellate level, and Gretchen Catlin, the University's Chief Facilities and

General Services Officer, typically served as the decisionmaker at the second and final appellate level. However, shortly after the issuance of the First RFP, Catlin recused herself from serving as the final decisionmaker due to her heavy involvement in its initial development and drafting. With Catlin's recusal, Ryan Low, the University's Vice Chancellor for Finance and Administration, stepped in as the final decisionmaker -- a role he had served in previously, though "not very frequently." Low then stopped participating in all University discussions and meetings about the sale of the Center.

### (b) The Internet Connectivity Hub Addendum

Prior to selecting a winning bid, the University formally modified the terms and conditions of the First RFP multiple times through the public release of "addendums." The Hutchinson Center, in addition to being a classroom building and conference space, has also long been home to a Networkmaine regional connectivity internet hub, which provides internet access to numerous public and private educational institutions, libraries, and community centers throughout the greater Belfast, Camden, and Rockland areas. Along with the sale of the Center, the University initially considered moving the internet hub entirely offsite.

In April 2024, following the initial submission deadlines for the First RFP[6] but prior to the award decision, the University formally issued Addendum 4 to the First RFP, alerting bidders that it planned to relocate the internet hub from its current location in a room inside the Center into an external "purpose-built utility building" to be constructed elsewhere on Center property.  The University explained that this plan would be cheaper and more efficient than relocating the hub off-site.  Among other things, Addendum 4 described the size of the "proposed pre-fabricated equipment shelter" and the fenced in area surrounding it, announced the University's plan to install a new generator within the fenced space to shore up the internet hub in the new location, and provided an aerial photograph marking two "recommended . . . locations" on the property for the new infrastructure.  Addendum 4 also informed bidders that, to "facilitate this relocation," the University would be "seek[ing] to establish a lease agreement or easement to house [the] equipment shelter . . . along with an easement that [would allow] for access for utility trucks and University vehicles to gain access to the fenced in area," and that lease "[n]egotiations [with the winning bidder] may include the transfer of the existing diesel generator

---

[6] The initial submission deadline for the First RFP was February 5, 2024, but that deadline was later extended to the end of March 2024 (via a formal addendum to the First RFP) and eventually was extended through the end of July 2024.

. . . within the [Center building] to the new owners." Finally, Addendum 4 informed bidders that "[u]ntil all site prep work, shelter placement and connectivity hub equipment relocation is completed, the University will need to retain 24x7x365 access" to the internet hub inside the building.

Robyn Cyr, the University's Senior Director of Strategic Sourcing, reached out to each of the respondents to inquire whether Addendum 4 would necessitate any changes to their previously submitted proposals. Calvary responded via email: "It does not change our submission. As you had stated in a previous bid meeting [the University's continued access to the internet hub] would be negotiated with the winning proposal. [Calvary is] happy to lease the future space and also provide 24 [hour] access in the interim."

About six weeks later, the University followed up on Addendum 4 by providing Calvary, Waldo, and Waterfall Arts with a proposed lease -- to be further negotiated and signed by the winning bidder -- drafted to secure the University's continued access to the internet hub in two "phases." More specifically, the lease stated that the "University will continue to operate the hub [inside the Center] Phase 1 plan . . . with an option to permanently relocate the hub as outlined in the Phase 2 plan[.]" With respect to "Phase 1," the lease specified that the University "require[d] a 'carve out'" allowing for the continued operation of the internet hub in its current site inside the Center "[u]ntil

- 11 -

all site prep work, shelter placement and connectivity hub equipment relocation is completed."  As for "Phase 2," the lease stated the University "propose[d] the relocation of the hub . . . to a purpose-built utility building" with a "lease agreement or easement" granting the University continued uninterrupted access to the hub following the relocation.

### (c) Award of the First RFP to Calvary

In mid-August 2024, the University informed Calvary that it had been selected as the "top-scoring" respondent to the First RFP, awarding the Church the exclusive right to negotiate with the University the terms and conditions of a final purchase agreement for the Center.[7]  In the award notification letter sent to Calvary, the parameters of the award were described as follows:

> This award notice does not constitute an agreement and does not obligate the University to enter into any agreement with the awardee or any other vendor.  Any actual contract executed by the University pursuant to the [First] RFP is contingent on the ability of the parties to reach agreement on final terms and conditions . . . .  The University will proceed with the present award [to Calvary] so long as it determines, in its sole discretion, that doing so is in the best interest of the University.

---

[7] The winning bid was selected by an "evaluation team," consisting of administrators from various University departments that used a "consensus approach to evaluate [submitted proposals] and assign evaluation points" to compare each proposal.  The final sale of the Center was "subject to . . . approval" by both senior University leadership and the Board of Trustees.

The University also provided all three bidders with an executive summary detailing the "consensus scoring" results for each of the three proposals. In a press release announcing its decision to sell the Center to Calvary, the University reported that various factors had distinguished Calvary's winning proposal, including the Church's offer of a $1 annual lease agreement in perpetuity for the internet hub, its willingness to waive inspection of the Center, and its offer of $250,000 in earnest money.

In the days following the public announcement, numerous area residents as well as University alumni, donors, students, faculty, and staff criticized the University's selection of a religious entity, and Calvary in particular, as the winning bidder. One online commentor, for example, referred to the decision as "disappointing," with another writing, "[t]hese evangelists from [Calvary] are just another religious cult that believes in magical thinking." Another comment read: "Boo UMaine. Enabling a little fascist factory." A Maine State Senator representing Belfast, who also was a member of Waldo's Board of Directors, publicly opined that "transferring [the Center] from public access and gifting it to a religious organization, any religious organization, seems completely inappropriate." Morgan Womack, Belfast Groups Challenging UMaine System's Sale of Hutchinson Center to Church, Portland Press Herald (Aug. 21, 2024) https://www.pressherald.com/2024/08/21/Umaine-system-faces-

- 13 -

criticism-for-sale-of-hutchinson-center-to-local-church/

[https://perma.cc/ZG6D-UVFV].

University leadership later attested that the scope of the negative community response to selection of Calvary was "unusual" for an RFP award, and the University responded to the backlash by, among other things, cataloging the correspondence received while staff generated a formal response plan.

2. **Protests by the Unsuccessful Bidders**

(a) **Initial Appeals to Piper**

Within five days of the announcement of the award to Calvary, both Waterfall Arts and Waldo submitted protests -- via letters addressed to Piper -- challenging the decision.

In its initial appeal, Waterfall Arts argued that its bid should have been scored higher because it was not credited for its "added value proposition" to allow the University to keep the internet hub in its current location inside the building for the life of the lease -- which Waterfall Arts argued would save the University the estimated $1 million cost of moving the hub into new space outside the building. Waterfall Arts also criticized the University's decision to award the First RFP to Calvary. Asserting that Calvary and "its parent and sister organizations have advocated on their websites against non-male/female sexual relationships and marriage," Waterfall Arts's protest questioned whether the University's proposed internet hub lease would be

"problematic" for Calvary given the lease's explicit requirement that the lessor refrain from discriminating on the basis of protected classes, including sex and sexual orientation.

In its appeal letter addressed to Piper, Waldo likewise challenged the way in which the University scored its proposal. And, like Waterfall Arts, Waldo criticized the University's decision to award the RFP to a religious entity, observing: "A [c]hurch by its very design could be perceived as limiting to some in the community (real or perceived) and not in alignment with the University's intention as outlined in its nondiscrimination section of the lease."

Finding no merit in either appeal of the University's decision, Piper denied both challenges, explaining in letters to each disappointed bidder: "After a thorough review of the solicitation process and all related requirements, I have determined that the award [to Calvary] will be upheld as originally issued." In her letter to Waterfall Arts, Piper specifically dismissed as irrelevant its "'value-added proposition' argument," observing:

> Value-Added Propositions in a procurement process are often referred to as cost avoidance or switching costs. If the University had planned to consider either cost avoidance or switching costs, the [First RFP] would have declared that fact in [the First RFP] . . . with associated points for the evaluation.

In both letters, Piper also specifically responded to the criticism levied against the University's decision to award the bid to the Church, writing that the University had seen "no evidence" supporting the disappointed bidders' allegations of protected-class discrimination by Calvary and noting that the "University does not, and will not, make decisions based on discriminatory criteria, including the content of a respondent's constitutionally protected religious speech."

After informing Waldo and Waterfall Arts that their initial appeals were unsuccessful, the University issued a second press release announcing that it had received and denied two "formal protest[s]" from "parties who submitted a non-selected proposal" and, accordingly, would be moving "forward in negotiating a final agreement for the sale of the [Center]" to Calvary. In that press release, the University acknowledged that, in the weeks since its initial announcement, it had received "at least 135 citizen comments" about the pending sale to Calvary. The University responded to criticism of its decision in the release, stating: the University "cannot discriminate, including on the basis of religion" as "[d]oing so would be against the law and inconsistent with the [University's] commitment to inclusion."

**(b) Final Appeals to Low**

In early September 2024, in letters addressed to Vice Chancellor Low -- the designated decisionmaker for the second,

- 16 -

final level of the internal administrative appeals process -- both Waldo and Waterfall Arts appealed Piper's decision to deny their respective challenges to the award of the First RFP to Calvary.

In addition to raising again the same perceived problems with the University's scoring of its bid, Waldo's appeal asked Low to reconsider whether the award to Calvary was "best for the community" and questioned whether the decision adhered to the University's "mission to public education and accessibility for all" and support for "diversity and inclusion." Waterfall Arts similarly reiterated its challenges to the scoring of its proposal, including its contention that it should have received credit for its cost-saving proposal to keep the internet hub in its current location. Like Waldo, Waterfall Arts also emphasized that "tempers and frustrations with the award decision [to Calvary] are running high in the community" and suggested that a reversal of the award would "ameliorate this situation and put the community and the University back on the same path together."

As Low would later attest in sworn statements to the court, his role as the final decisionmaker in reviewing award protests was to focus on asserted errors in the University's process. Upon conducting this review, Low found no merit in Waldo's appeal and merit in only one of the challenges raised in Waterfall Arts's appeal. Specifically, Low would later testify that he was "intrigued" by Waterfall Arts's argument that its score

should have reflected its cost-saving proposal to leave the internet hub in its current site within the Hutchinson Center building for the life of the lease, despite the First RFP's discussion in Addendum 4 and the accompanying proposed lease of relocating the internet hub outside the building on Center property. Based on an estimate Networkmaine provided to the University of the anticipated expense to relocate the internet hub and its fiber optic cables, combined with the estimated cost of a new generator, electrical work, site prep, and building construction, Low agreed with Waterfall Arts that if leaving the hub in place was in fact feasible it could potentially save the University approximately $500,000 in costs. Low decided to reach out to the University's Chief Information Officer to see if such an option would even be possible and workable for the University and was told the proposed solution was indeed realistic from an information technology standpoint.

Armed with this information, Low decided that he disagreed with Piper's decision to disregard Waterfall Arts's cost-avoidance argument. In his view, the fact that the cost-avoidance factor was not explicitly incorporated into the First RFP's point scale should not have been the determinative consideration in denying the Waterfall Arts appeal. Reasoning that the University "would be significantly better off" if it "could avoid the approximate $500,000 cost of moving the internet

hub," Low instead determined that the University's failure to include proposed cost-avoidance measures in the First RFP's point scale was "a flaw in the scoring system" and that this flaw was significant enough to warrant overturning the First RFP award and restarting the public procurement process. Before informing the three respondents of his decision, Low conferred with the University's general counsel, later testifying that he did so to ensure that he had followed all steps necessary to grant an award protest and to overturn an award.

In mid-September 2024, Low issued letters to each of the three bidders informing them of his decision to rescind the University's award of the First RFP to Calvary. In his letter to Waterfall Arts, Low more specifically explained his decision to grant its appeal as follows:

> [A]fter a thorough review, I agree with your assertion that the evaluation criteria did not allow for due consideration of all materially relevant financial details . . . .
>
> . . . [I]n Addendum 4, the [University] stated that in the event of a real property sale, its existing Networkmaine hub within the [Center] would need to be relocated . . . in order to maintain internet connectivity for midcoast institutions. . . . While other respondents proposed favorable lease arrangements and access to the property, [Waterfall Arts]'s creative alternative offer to allow the hub to permanently remain within the existing building would significantly reduce the cost of site work, new construction and relocation for the [University].

Low additionally explained why his determination as the final decisionmaker differed from Piper's initial decision:

> In ruling on your Aug. 19, 2024 protest as it relates to this point, [Piper] dismissed [Waterfall Arts]'s claim about "its value-added proposition" because the [U]niversity's original RFP and related evaluation criteria had not taken so-called cost avoidance into consideration. While that is true . . . the avoidance of hundreds of thousands of dollars in relocation expenses presents clear financial and operational benefits that are decidedly in the best interests of the [University] and thus should have been valued in the criteria by which all proposals were scored.

**3. The Second RFP**

About three weeks later, the University issued a new RFP, RFP #2025-031 (the "Second RFP"), that largely mirrored the original terms. However, critically, in place of Addendum 4 and the proposed lease's description of the hub's relocation outside of the building, the Second RFP instead outlined a mandatory leaseback provision to keep the internet hub in its existing location within the building, requiring the winning bidder to lease back 120 square feet of closet space to the University for an annual fee of no more than $3,000. This lease term would extend for five years, with potential renewals. Like the First RFP, the Second RFP stated that submissions would again be evaluated and "consensus scored" on a 100-point scale, but now up to five of those points would be allocated to measuring the "Networkmaine

Lease Cost," with five points assessing any "contingencies" and the remaining points scoring the "purchase price."

The University received timely bids from the same three respondents. Calvary's revamped bid offered a purchase price of $1.1 million, a free lease to the University for the internet hub space, and an offer to pay all utilities related to the internet hub.

The University ultimately awarded the Second RFP to Waldo, the entity that received the highest score based on the modified selection criteria, thereby granting Waldo the right to negotiate a final agreement to purchase the Center. Waldo's new offer of $3.06 million was more than $1 million higher than Waterfall Arts's and almost $2 million higher than Calvary's. On November 20, 2024, Calvary -- the recipient of the lowest score -- submitted a first-level protest appealing its score and the University's decision to award the bid to its competitor, which was denied by Piper in early December. Finding no errors in the process for the Second RFP, Low denied the second, final level of Calvary's appeal in mid-December 2024.

B. **The District Court's Decisions**

On November 19, 2024 -- the day before submitting its initial challenge of the Second RFP to Piper -- Calvary filed suit in federal court alleging that the University's decision to rescind the award of the First RFP to Calvary was unconstitutional and

seeking to halt the University's sale of the Center to Waldo.[8] Relying on quoted language perceived as anti-religious in both Waldo and Waterfall Arts's letters of appeal and in various public statements by community members and pointing to alleged irregularities with respect to the First RFP, Calvary asserted that the University's decision was impermissibly motivated by religious animus in violation of the Equal Protection and Free Exercise Clauses of the United States Constitution.[9]

The court held oral argument on Calvary's motion for a TRO on January 6, 2025. After the hearing, and solely on the paper record, the court denied Calvary's motion, finding that Calvary had "not produced enough probative circumstantial evidence of impermissible religious bias for the [c]ourt to conclude that it is likely to succeed on the merits of its Equal Protection Clause claim" and that it had "not carried its burden to demonstrate that it is likely to succeed on the merits of its Free Exercise Clause claim." Calvary Chapel Belfast v. Univ. of Me. Sys., No. 24-cv-00392, 2025 WL 71701, at *9, *10 (D. Me. Jan. 10, 2025). The court

---

[8] The parties later agreed to delay the federal court proceedings while Calvary protested the award decision through the University's internal appeal process.

[9] Calvary's complaint included other claims, but Calvary's motion for a preliminary injunction was based solely on Counts I (violation of the Equal Protection Clause) and II (violation of the Free Exercise Clause).

also found that Calvary failed to establish that it would suffer irreparable harm absent injunctive relief.  Id. at *10.

In early March 2025, the court held an evidentiary hearing on Calvary's motion for a preliminary injunction. Twenty-three joint exhibits were entered into evidence, and the court heard testimony from four witnesses: Piper, Low, Cyr, and Pastor Greg Huston.  As detailed above, Low testified that neither the fact that Calvary is a religious institution nor any of the community opposition to Calvary played any role in his decision to grant Waterfall Arts's appeal.  Rather, Low testified, "the one and only ground upon which" he "rescinded [the First RFP]" was "cost savings."

Following the submission of post-hearing briefs, the court issued a written decision denying Calvary's motion for a preliminary injunction.  Specifically finding the testimony of "all [four] witnesses credible," the court concluded that Calvary again had not demonstrated a likelihood of success on the merits of either its Equal Protection or Free Exercise Clause claims. Calvary Chapel Belfast v. Univ. of Me. Sys., No. 24-cv-00392, 2025 WL 1333243, at *1, *13 (D. Me. May 7, 2025).  As of early October 2025, the University had moved forward in its negotiations with Waldo but had not yet closed the sale of the Center "because of the pendency of this . . . appeal."

**II.**

## A.  Standard of Review

We review the district court's denial of Calvary's preliminary injunction motion for abuse of discretion. US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC, 121 F.4th 339, 347 (1st Cir. 2024).  Proceeding with the understanding that such injunctive relief is an "extraordinary and drastic remedy that is never awarded as of right," id. (quoting Peoples Fed. Sav. Bank v. People's United Bank, 672 F.3d 1, 8-9 (1st Cir. 2012)), we examine "answers to abstract legal questions de novo, findings of fact for clear error, and judgment calls with significant deference to the trial court," id.  Put differently, we will reverse the district court's decision "only if the court clearly erred in assessing the facts, misapprehended the applicable legal principles, or otherwise is shown to have abused its discretion." Wine & Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36, 46 (1st Cir. 2005).

A plaintiff requesting a preliminary injunction "must establish" that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) the requested injunction is in the public interest. Doe v. Trump, 157 F.4th 36, 46 (1st Cir. 2025) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)).  "When . . . the movant 'do[es] not argue on appeal that the [other three factors] mandate

an injunction even if [its] claims are not likely to succeed on the merits,' we may rest an affirmance solely on an unlikelihood-of-success holding."[10] Becky's Broncos, LLC v. Town of Nantucket, 138 F.4th 73, 78 (1st Cir. 2025) (quoting Ocean State Tactical, LLC v. Rhode Island, 95 F.4th 38, 43 (1st Cir. 2024)). The logic of that option is straightforward: "if the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors" usually become "matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).

## B. Equal Protection Claim

Calvary asserts an intentional discrimination claim, arguing that the University violated the Equal Protection Clause by carrying out the facially neutral public procurement process in a discriminatory way. In support of that claim, Calvary contends that the district court erroneously concluded that the Church was unlikely to succeed on the merits of its claim because of a flaw in its legal analysis. See Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 221 (1st Cir. 2003) ("An error of law is, of course, an abuse of discretion."). Specifically, Calvary argues that the

---

[10] As stated above, based on its conclusion that Calvary failed to adduce sufficient evidence to demonstrate a likelihood of success on the merits of its equal protection and free exercise clause claims, the district court denied the preliminary injunction motion without reaching the remaining factors.

court created a "novel rule" when it required Calvary "to make a direct 'showing connecting the animus in the community to the government action' to raise an inference of discriminatory intent." Instead, Calvary asserts, the court should have "engage[d] in a sensitive inquiry into all available direct and circumstantial evidence that may be probative of a discriminatory purpose." Calvary then asserts that the district court also committed clear error in its factual analysis of the evidence supporting its request for a preliminary injunction.

We consider these arguments in turn.

**1. Assertion of Legal Error**

The Equal Protection Clause of the Fourteenth Amendment requires that "similarly situated persons . . . receive substantially similar treatment from their government." Davis v. Coakley, 802 F.3d 128, 132 (1st Cir. 2015) (quoting Tapalian v. Tusino, 377 F.3d 1, 5 (1st Cir. 2004)). A plaintiff claiming a violation of the right to equal protection therefore must show (1) that "compared with others similarly situated, [the plaintiff] was selectively treated" and "(2) that such selective treatment was based on impermissible considerations such as . . . religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Id. at 132-33 (quoting Rubinovitz v. Rogato, 60 F.3d 906, 910 (1st Cir. 1995)) (laying out prima facie case for a disparate treatment Equal

- 26 -

Protection Claim); see also Buchanan v. Maine, 469 F.3d 158, 178 (1st Cir. 2006) (similar).

A plaintiff need only establish that impermissible bias was one of the "motivating factor[s]" for its selective treatment -- not the only motivating factor. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265-66 (1977). But, at the end of the day, some "[p]roof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." Id. at 265. Of course, direct evidence of discriminatory purpose is rarely available. See, e.g., Riordan v. Kempiners, 831 F.2d 690, 697 (7th Cir. 1987) ("Defendants of even minimal sophistication will neither admit discriminatory animus nor leave a paper trail demonstrating it[.]"). It is thus well established that impermissible discriminatory animus can be inferred from the totality of the circumstances, including both direct and circumstantial evidence. See Arlington Heights, 429 U.S. at 266-68; Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos., 996 F.3d 37, 45 (1st Cir. 2021) (describing the Arlington Heights framework); see also, e.g., Mi Familia Vota v. Fontes, 129 F.4th 691, 725 (9th Cir. 2025) (referring to the Arlington Heights framework as a "totality of the circumstances" test).

More specifically, to assess discriminatory intent in equal protection selective treatment cases, courts are instructed to conduct "a sensitive inquiry into such circumstantial and direct

evidence of intent as may be available," including reviewing "[t]he historical background of the decision," "[t]he specific sequence of events leading up to the challenged decision," and "contemporary statements by members of the decisionmaking body[.]" Arlington Heights, 429 U.S. at 266-68. As particularly relevant here, in assessing the totality of the circumstances, an established departure "from the normal procedural sequence" followed by the decisionmaker can provide telling circumstantial evidence of discriminatory intent, as can an established "[s]ubstantive departure[]" in that decisionmaking, "particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." Id. at 267; see also Macone v. Town of Wakefield, 277 F.3d 1, 6-7 (1st Cir. 2002) (observing that both substantive and "procedural abnormalities can provide a basis for finding discriminatory intent").

Calvary insists that instead of applying this totality-of-the-circumstances framework, the district court improperly applied what amounted to a heightened Arlington Heights standard. That is, Calvary maintains that the court erred by demanding a "provable connection between the religiously hostile community animus and the [University's] alleged procedural irregularities," thus overstating the required showing for a violation of the Equal Protection Clause.

To support its allegations of anti-religious discrimination by the University, Calvary's complaint cited language used by community members angered by the University's decision to sell the Center to Calvary in various internet postings and in written communications to University officials. It also quoted passages from Waterfall Arts's and Waldo's appeal letters criticizing the University's selection of Calvary as the winning bidder.[11] Post-hearing, Calvary's briefing seeking injunctive relief asserted that the University's rescission of the award to the Church immediately following this public outcry, as well as several "procedural anomalies" in the First RFP process, constitute circumstantial evidence of the decisionmaker's discriminatory intent. In making this argument, Calvary pressed two issues in particular: Low's decision to cancel the First RFP (thereby revoking the award to Calvary) rather than to negotiate the "option" of keeping the internet hub in its present location

---

[11] "We look at the allegations in the plaintiff['s] complaint[] and the evidence from the preliminary injunction proceedings" when considering a preliminary injunction appeal. Doe, 157 F.4th at 47. Calvary provided the source material for the quoted language in attachments to its verified complaint or within the complaint itself. See generally 28 U.S.C. § 1746 (unsworn declarations); Fed. R. Civ. P. 11(b)(3) (pleadings signed under penalty of perjury certify that "the factual contentions have evidentiary support"). Much of the source material was also included in the joint exhibits introduced by the parties at the preliminary injunction hearing. In any event, at this stage in the litigation, the University has not contested that there was animus towards Calvary in the community at the time, maintaining instead that its decisionmakers were not influenced by that animus.

directly with the Church (which we will call the "cancellation decision"); and the classification of Waterfall Arts's appeal as an award protest instead of dismissing it outright as an untimely specification protest (which we will refer to as "the protest consideration issue").

Faced with these contentions, the district court reasonably began its analysis by "survey[ing] case law where public pressure combined with procedural anomalies was held sufficient to show discriminatory purpose."  Calvary Chapel Belfast, 2025 WL 1333243, at *8 (collecting cases).  The court observed that "[o]ften, the connection between the community animus and the government action is a procedural irregularity, a hurdle that deviates from the procedural norms, or a substantive departure from factors usually considered important to the decisionmaker." Id.  The court further recognized that community sentiment can have an improper impact even if the decisionmaking official "does not personally share those views."  Id.

Despite what the Church suggests, the court did not rigidly demand any "provable connection" between the community animus and a procedural irregularity or improperly "fuse[]" those two Arlington Heights factors.  Instead, it merely noted that there must be something suggesting that the government actually bowed to such pressure and highlighted that a procedural irregularity is one way that can sometimes imply such acquiescence.  The court

then closely examined the proffered evidentiary support for the two primary irregularities alleged by Calvary -- the cancellation decision and the protest consideration issue. See id. at *11-12 (referring to the first alleged irregularity as a "substantive deviation" and the latter as a "procedural deviation"). The court ultimately found that evidence insufficiently probative of the type of irregularities contemplated by Arlington Heights -- i.e., a departure from the standard process for decisionmaking or from the usual substantive factors used in decisionmaking -- to support an inference that discrimination was a true motivating factor for the decision. See id. (citing Vill. of Arlington Heights, 429 U.S. at 267).

The court's articulation of the applicable inquiry aligns with the required analysis set forth above. The court recognized that widespread religious animus in the community can, in certain circumstances, support an inference that a government official acted with discriminatory intent by essentially adopting the community's view even if the official did not personally share that view. See, e.g., Jesus Christ is the Answer Ministries, Inc. v. Baltimore Cnty., 915 F.3d 256, 263 (4th Cir. 2019) ("[A] government decision influenced by community members' religious bias is unlawful, even if the government decisionmakers display no bias themselves. Such impermissible influence may be inferred where expressions of community bias are followed by irregularities

in government decision-making." (citations omitted)); <u>Smith</u> v. <u>Town of Clarkton</u>, 682 F.2d 1055, 1066 (4th Cir. 1982) (similar). But the presence of community opposition does not, without more, imply a conclusion of intentional discrimination by the decisionmaker. <u>See</u>, <u>e.g.</u>, <u>Jesus Christ is the Answer Ministries, Inc.</u>, 915 F.3d at 263 (noting that impermissible influence "<u>may</u> be inferred where expressions of community bias are followed by irregularities in government decision-making" (emphasis added)). And here the court found scant evidentiary support for the alleged irregularities -- "the more" -- urged by Calvary.

Though Calvary itself stressed the purported irregularities in its complaint and arguments to the district court, Calvary now disagrees on appeal with the critical importance to its case of establishing any such irregularities. Calvary insists instead that the University's "revocation of the Church's winning bid" amidst "vociferous community opposition" was itself "sufficiently probative of discriminatory intent." Put another way, the Church argues that, when the community protest is loud or "relentless" enough, it is virtually impossible for a government actor to make a decision that is not impermissibly "tainted" by that public pressure.

That argument is simply not the law. As the University points out, Calvary is arguing, in effect, for a per se rule: if a religious entity seeks legal relief amid widespread community

opposition to the religious group's position, the presence of that animus alone establishes the causal connection between the public pressure and the governmental action. To the contrary, as the district court observed in its decision denying Calvary's motion for a TRO,

> [t]he fact that there was religious animosity present in the community and even argued to the [University by Waldo and Waterfall Arts] as a basis for appeal cannot mean that the [University] is locked into a decision that it determined would result in a substantial net financial loss for it when there is no other evidence to suggest it acted on impermissible motives.

Calvary Chapel Belfast, 2025 WL 71701, at *9.

Each case on which Calvary relies to support its inevitable "taint" argument is factually or procedurally inapposite. For example, in Innovative Health Sys., Inc. v. City of White Plains, 117 F.3d 37 (2d Cir. 1997), the Second Circuit affirmed the district court's conclusion that a drug and alcohol rehabilitation center was likely to succeed on the merits of its disability discrimination case based on the argument that the zoning board allowed illegal prejudice in the community to influence the decisionmaking process. Id. at 49. But the court did so only upon finding that "[t]here is little evidence in the record to support the [zoning board]'s decision on any ground other than the need to alleviate the intense political pressure from the surrounding community brought on by the prospect of drug- and

- 33 -

alcohol-addicted neighbors." Id. The court additionally concluded the adverse decision was "highly suspect in light of the requirements set forth in the zoning ordinance" and that the "lack of a credible justification for the . . . decision raises an additional inference that the decision was based on impermissible factors[.]" Id.; see also Mhany Mgmt., Inc. v. Cnty. of Nassau, 819 F.3d 581, 611 (2d Cir. 2016) (noting that the "district court was entitled to conclude, based on the Arlington Heights factors, that something was amiss here," where, in addition to the community animus, the government "abrupt[ly]" deviated from its historical decisionmaking process and where the testimony of government officials was not credible).[12]

In short, there was no error of law in the district court's approach to Calvary's equal protection claim. To determine whether the University's stated reason for its decisionmaking was likely to be found pretextual, the court properly looked at the totality of the circumstances, see Arlington Heights, 429 U.S. at 266-67, including the intensity of the community animus and the timing of Low's decision in its immediate wake, see Calvary Chapel Belfast, 2025 WL 1333243, at *5-6, *8, and appropriately focused

---

[12] Another case highlighted by Calvary, Avenue 6E Invs., LLC v. City of Yuma, 818 F.3d 493, 509 (9th Cir. 2016), is procedurally inapposite given that the case, in relevant part, was at the motion to dismiss stage, and the court accepted as plausible the existence of the procedural irregularities identified by the plaintiff.

its analysis on the two alleged procedural irregularities that Calvary had itself highlighted -- the cancellation decision and the protest consideration issue, see id. at *9-12.  In completing its inquiry into whether the government decisionmaker -- not the community -- acted with discriminatory intent, the court credited Low's testimony that he was motivated solely by cost savings, as the court was entitled to do, see id. at *1, *6, *11-12, and the court found Calvary's evidence of any irregularity to be wanting, see id. at *11-12, a finding that we will examine closely as part of our clear error review.  Calvary offered no other direct or circumstantial evidence suggesting that Low adopted or bowed to the discriminatory animus of others.  The court thus concluded that the Church had not carried its burden to establish that it was likely to succeed on the merits of its Equal Protection Clause claim.  See id. at *12.

### 2. Assertion of Clear Error in the Court's Factfinding

We proceed, then, to our highly deferential clear error review of the critical factual findings underpinning the court's ultimate determination -- i.e., that, based on a review of the totality of the circumstances, Calvary did not establish that the University's cost-saving rationale for the decision to cancel the First RFP was pretextual, and hence Calvary was unlikely to succeed on the merits of its claim of intentional discrimination under the Equal Protection Clause.  See Stauffer v. Internal Revenue Serv.,

939 F.3d 1, 9 (1st Cir. 2019) (noting that the "clear-error standard is extremely deferential" (quoting United States v. Marquez, 280 F.3d 19, 26 (1st Cir. 2002))); see also Wine & Spirits Retailers, Inc., 418 F.3d at 46 (findings of fact underpinning an equal protection claim are reviewed for clear error in abuse-of-discretion review of a denial of injunctive relief); Ramos v. Roche Prods., Inc., 936 F.2d 43, 46 (1st Cir. 1991) ("The Supreme Court has held that 'a finding of intentional discrimination is a finding of fact.'" (quoting Anderson v. Bessemer City, 470 U.S. 564, 573 (1985))). In performing this clear error review, we focus on the court's critical findings that the cancellation decision and the protest consideration issue were not irregularities suggestive of pretext. See Calvary Chapel Belfast, 2025 WL 1333243, at *11 ("The Court does not conclude the isolated use of the term 'option' in a draft lease that was never executed is probative of pretext or discriminatory animus."); id. at *12 ("The Court does not conclude the [University]'s consideration of the disappointed bidders' protests is evidence of discriminatory animus.").[13]

---

[13] We note that these preliminary factual findings by the district court are not binding on the ultimate decisionmaker, whether that decisionmaker is the court in future summary judgment proceedings or a jury in a future trial. See Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 98 n.6 (1st Cir. 2020) ("We recognize that, at the preliminary injunction stage, this [factual] finding is merely a predicted outcome, subject to reexamination[.]"); Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 6 (1st Cir. 1991) (noting that preliminary injunction decisions "are to be understood as statements of probable outcomes" only); Roland Mach.

We begin, however, with an observation regarding the primary obstacle Calvary must surmount to prevail before this court. Key to each of the district court's rulings on the alleged procedural irregularities, and therefore to ours, is the court's determination that Low testified credibly that his decision to undo the award of the First RFP to Calvary was driven solely by a desire to save the University from an unnecessary half-million-dollar expense. See id. at *1, *6, *11-12.

We recently observed that "[w]hen a judge's factual 'finding is based on [a] decision to credit the testimony of . . . [a] witness[] . . . who[] has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.'" Urizar-Mota v. United States, 171 F.4th 445, 465 (1st Cir. 2026) (quoting Anderson, 470 U.S. at 575). As we

---

Co. v. Dresser Indus., Inc., 749 F.2d 380, 388 (7th Cir. 1984) (observing that the preliminary injunction framework does not determine the wrongfulness of a defendant's conduct or assign rights and entitlements to settle a dispute but rather functions to help judges avoid the more costly of two errors: "the error of denying an injunction to one who will in fact (though no one can know this for sure) go on to win the case on the merits, and the error of granting an injunction to one who will go on to lose"); Jacob Cogdill, Note, The Law of Vibes: Much Ado About Preliminary Injunctions, 101 Wash. U. L. Rev. 1345, 1346-47 (2024) ("As opposed to other pretrial remedies like summary judgment or dismissal for failure to state a claim, preliminary injunctions enforce potentially harsh penalties against parties without judging the sufficiency of a plaintiff's claims or the wrongfulness of a defendant's conduct.").

shall explain, that observation is apt here. In reviewing the asserted procedural irregularities, we find no basis for discrediting the court's determination that "Low made the decision to rescind the award and issue a new RFP based on one of the same factors the second-appeal-level administrator would usually consider -- cost savings." Calvary Chapel Belfast, 2025 WL 1333243, at *11.

**(a) The Cancellation Decision**

In defending against Calvary's assertion that Low's cost-saving rationale for rescinding the award to Calvary and starting a new RFP process was pretextual, the University relies on the testimony and declaration of Low to assert that direct negotiations with Calvary about leaving the internet hub in its present location would have contravened the First RFP's prohibition against "significantly vary[ing] the content, nature or requirements of . . . the [RFP] to an extent that may affect the price of goods or services requested." More specifically, in his letters to both Waterfall Arts and Calvary explaining his reasoning for granting Waterfall Arts's second-level appeal, Low observed that issuing the second RFP "would appropriately take into account both the real and potential value of all aspects of the proposals including those that related to" the internet hub. Low's reasoning is corroborated by the declaration submitted to the court prior to the TRO hearing by Gretchen Catlin (the

University's Chief Facilities and General Services Officer, and the recused second-level decisionmaker for the First RFP).  In her declaration, Catlin explained that a new RFP would offer the dual benefit of requiring all bids to include that cost-saving factor and informing prospective bidders that similar cost-saving proposals would be awarded points in the selection process.

Calvary contends that this explanation is belied by the language the University used in drafting the proposed lease that was circulated with Addendum 4.  Calvary argues that, by referring in the lease to the permanent relocation of the internet hub as "an option"[14] the University conveyed to First RFP bidders that the cost-saving measure of leaving the hub in place had always been a viable possibility.  Therefore, Calvary argues, a new RFP was

---

[14] The draft lease accompanying Addendum 4 to the First RFP read as follows:

> Currently situated within the Hutchinson Center in room 100Y, the hub is backed up by a generator . . . .
>
> [T]he University will continue to operate the hub [in the] Phase 1 plan . . . with an option to permanently relocate the hub as outlined in the Phase 2 plan."

The draft lease also detailed the treatment of the hub in those two referenced phases: Phase 1 specified that the University would "require[] a 'carve out'" allowing for the continued operation of the internet hub in its current site inside the Center "[u]ntil all site prep work, shelter placement and connectivity hub equipment relocation is completed;" Phase 2 specified that the University "proposes the relocation of the hub . . . to a purpose-built utility building" with a "lease agreement or easement" granting the University continued uninterrupted access to the hub following its relocation.

unnecessary and religious animus (rather than cost saving) was the true reason for rescission of the award.

The district court disagreed, instead finding that Calvary's suggested reading of the lease was inconsistent with the vast majority of the record evidence, see id. at *11, which corroborated Low's testimony that Addendum 4 to the First RFP was issued for the purpose of alerting the bidders of the University's then-definitive plan to move the internet hub out of the building as soon as practicable. That understanding was supported by the terms of the lease, which described two phases, with Phase 1 consisting of a temporary, transitional period that would last only until the new, external utility building could be constructed. It was also supported by the language of Addendum 4 itself, which described in detail all aspects of the second phase, including the specific dimensions of the "pre-fabricated equipment shelter" and the fenced-in area surrounding it, the need to install a new generator within the fenced space, and even the suggested locations for the placement of the planned infrastructure.

As the district court pointed out, Calvary's own witness, Pastor Huston -- the "[l]ead point of contact" for Calvary's bid -- offered testimony consistent with Low's explanation. See id. at *10. Huston began his hearing testimony by stating that he read the word "option[]" in the lease to mean that phase 2 was "discretionary, I suppose." He then testified

that, when Calvary advised the University that the terms of Addendum 4 and the circulated lease did not require any changes to its already-submitted offer to purchase, the Church knew that it had to accommodate the University "should they move" the internet hub outside. However, in a subsequent answer on direct examination, Huston stated that he understood that, by issuing Addendum 4 and circulating the proposed lease, the University was informing the bidders that "the hub would stay [within the Center] until it was moved at a certain point." He then confirmed on cross-examination that Calvary's response to the First RFP incorporated an understanding that "ultimately, the hub would be moved outside."

In addition, contemporaneous documents in the record indicated that, similar to Low, Calvary understood during this period that moving the internet hub outside of the Center was a requirement. For example, in Calvary's email message telling the University the Addendum and lease did not change its bid, Calvary affirmed that it agreed to "lease the future space" to the University and would "also provide" the University round-the-clock access to the current space "in the interim." (Emphasis added.) In another email exchange about six weeks later, Calvary corresponded with the University regarding the location and landscaping of the to-be-constructed utility building. That email read as follows:

As far as location we would like to put the
ground lease location in the Northwest corner
of the lot . . . between the current sign and
the property line adjacent to Sweetser Dr. to
keep it out of usable space. We would want
the University to plant shrubs around the
perimeter for improved esthetics.

Moreover, the district court credited the testimony of
Low and Piper, the two University witnesses who heard the appeals
concerning the First RFP. See id. at *1, *10. Both similarly
testified that, at the time they were considering the appeals,
they understood that the hub would be relocated. Low, as the
University's final decisionmaker, candidly acknowledged at the
preliminary injunction hearing that sloppy drafting by the
University in its use of the word "option" could be read to suggest
that the move of the internet hub outside the Hutchinson Center
was discretionary, and hence leaving the hub in the building was
always an alternative. But Low testified that when he was
reviewing the protest materials from Waldo and Waterfall Arts, he
did not "realize" that leaving the hub inside the Center "was truly
an option" because "[e]verything in all of the materials led [me]
to believe that there was going to be a phase 2" in which the hub
would be relocated. Low then explained that because he believed
that the First RFP, including Addendum 4, did not contemplate the
possibility of the internet hub remaining in the existing building,
and because he thought bidders might change their offers in

- 42 -

response to a new RFP requiring the purchaser to permanently house the hub, he felt that "rescission of [the First RFP] . . . was absolutely necessary" for the University to "avoid the $500,000 relocation expense."

Finally, as the district court acknowledged, it is possible that Low was "mistaken about whether he was required to rescind the award to the Church in order to leave the hub in place permanently[.]" Calvary Chapel Belfast, 2025 WL 1333243, at *11. But the district court effectively found that even if Low was mistaken it was a good faith mistake that was not tainted by religious bias. See id. Given the evidence recounted above concerning Addendum 4 and the lease -- the testimony of Low, Piper and Huston, and Calvary's email messages -- we find no basis in the record before us to conclude that the judge clearly erred in believing Low that religious bias did not taint his decision to rescind the award to Calvary at the end of the First RFP process.

**(b) The Protest Consideration Issue**

We likewise find no clear error in the court's finding that the University's treatment of Waterfall Arts's appeal as a timely award protest was not a procedural deviation suggestive of pretext. In both its first- and second-level administrative appeals of the award to Calvary, Waterfall Arts challenged the evaluation committee's failure to award any points for their proposal to leave the internet hub in place, thereby saving the

University the costs of moving the facility. As the initial decisionmaker, Piper denied the protest, reasoning that cost-saving measures were not among the scoring criteria of the First RFP. Low, on the other hand, concluded that the omission of cost-saving considerations was a flaw in the first RFP's criteria, and he thus found Waterfall Arts's protest valid.

Calvary asserts that both decisions were problematic because Waterfall Arts's argument was a specification protest -- not an awards protest -- and thus needed to be raised before the deadline for response submissions. Relying on the testimony of both Piper and Low, which it credited, the district court concluded that Calvary had not adduced sufficiently compelling evidence of a procedural deviation and that, even if the process was unusual, the University's handling of the protest was not suggestive of pretext. See id. at *12.

Piper testified that, in her experience evaluating RFP protests, the argument by Waterfall Arts was properly categorized and evaluated as a timely post-award protest. She explained that her judgment that the First RFP excluded cost-avoidance as a factor warranting points did not involve the sort of argument raised in a specification protest, which challenges a factor that is disqualifying at the outset of the bid process. Such a factor needlessly limits competition, and a pre-deadline protest allows for a potential remedy before the close of bidding. In her

testimony, Piper provided the following illustrative example of a specification protest to a hypothetical RFP for the delivery of office supplies requiring that supplies had to be delivered in "a yellow van with a man with a mustache on it": a specification protest would be a means for "Staples or Office Max to say . . . [t]hat's not a fair specification.  If you're trying to just get delivery, we should be able to bring them in our white van."

Piper pointed out that, unlike the exclusionary factor of the color of a van, Waterfall Arts's administrative appeal was a "protest[] of the award itself," objecting to the allocation of points resulting from an omission in the scoring factors that was not apparent when the First RFP was issued.  As Piper stated, how an RFP's scoring criteria will be applied is simply "not something that" a responding bidder would "have any insight to until after the award's been made."

Like Piper, Low testified that he believed the argument made by Waterfall Arts in its appeal was appropriately before him as an award protest because it was a challenge to the University's "scoring" approach.  He explained that it was only upon reading Waterfall Arts's "object[ion] to the scoring" of its award that it occurred to him that cost-saving factors should have been included in the criteria for evaluating the bids all along.

Relying on Piper's testimony in particular, the district court agreed that, ultimately, Waterfall Arts simply "could not

have known in advance how the scoring criteria would be applied to their responses." Id. Indeed, if the imprecise use of the word "option" in Addendum 4 and the lease left Waterfall Arts with the impression that the cost-saving benefit of retaining the internet hub in the building would be considered and credited, while Calvary and Waldo appeared to construe that same language to require the internet hub to be moved out of the building, the full benefit of this particular cost-saving proposal could only have been understood after the award process had fully played out. We thus cannot fault the district court's conclusion that the record in no way compelled a finding that the University deviated from its typical procedures in treating Waterfall Art's argument as an award protest, not an untimely specification protest.

Hence, on the record before us, we detect no clear error in the district court's factual findings and reasoned judgment that, based on the totality of the circumstances, Calvary did not show sufficient "[p]roof of . . . discriminatory intent or purpose" for the court to conclude that Calvary was likely to succeed on the merits of its Equal Protection Claim.[15] Arlington

---

[15] Calvary also makes three additional arguments in its briefing, largely undeveloped, on the issue of discriminatory intent. None has merit. First, Calvary asserts that discriminatory intent is shown by the fact that the University overruled its strategic-procurement experts. However, given that the district court cited record evidence and credited testimony by Low and Piper that each had deep expertise and related professional experience relevant to the strategic-procurement process -- Low in

- 46 -

<u>Heights</u>, 429 U.S. at 265. The district court analyzed all of Calvary's circumstantial evidence of alleged discriminatory animus and made supportable credibility and other factual findings that the Church did not establish any procedural irregularities probative of discriminatory intent or any other link between the hostility in the community and the University's decisionmaking. To the contrary, ample record evidence corroborated Piper's hearing observation that the University's two-level appeal process worked "exactly how [it was] set up to work."

---

finance, and Piper in "procurement and sourcing" -- we see nothing to suggest that the University's appeal process played out in anything but the typical fashion and as designed.

Next, Calvary presses the fact that the discriminatory impact of the decision was clearly foreseeable. To be sure, it was "foreseeable" that Low's decision to rescind the award of the First RFP to Calvary would have a negative impact on a church. However, a negative impact is not equivalent to a discriminatory one, and here Calvary has made no effort to frame its lawsuit as one of disparate impact on a religious entity, focusing instead on alleged disparate treatment. As we have explained, the court appropriately credited Low's testimony that neither the fact that Calvary is a religious institution nor any of the community opposition to Calvary played any role in his decision to grant Waterfall Arts's appeal.

Finally, Calvary asserts that, in restarting the public procurement process rather than negotiating the placement of the internet hub with Calvary, the University ignored less discriminatory avenues and thereby revealed its discriminatory intent. This argument is simply a reformulation of the claim that Piper and Low did not testify credibly when they explained their non-discriminatory reason for restarting the public procurement process. We have already explained that the district court's rejection of that claim was not clear error.

## C. Free Exercise Claim

Under the Free Exercise Clause, the government must act neutrally toward religious beliefs and "cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." Masterpiece Cakeshop v. Colo. C.R. Comm'n, 584 U.S. 617, 638 (2018). In our analysis of Calvary's equal protection claim, we determined there is no basis for overturning the district court's finding that Calvary failed to adduce sufficient evidence that the University's decision to rescind the award of the First RFP to Calvary and to start a new RFP process was attributable to religious animosity. Thus, Calvary likewise failed to establish a likelihood of success on the merits of its Free Exercise Claim.

## III.

The district court did not abuse its discretion when it denied Calvary's motion for a preliminary injunction because it applied the appropriate legal standards and made no clear error in its factual determination that the University's decisions were not tainted by religious bias. Therefore, Calvary failed to demonstrate a likelihood of success on the merits of either of its constitutional claims -- the sine qua non of the preliminary injunction analysis. New Comm Wireless, 287 F.3d at 9. We need

not consider the remaining preliminary injunction factors. See id.

The district court's decision is therefore affirmed.

So ordered.